UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Michael Patrick Keefe, an individual, | Court File No.: 09-2941 JMR/SRN |
| Plaintiff, | |
| vs. | |
| City of Minneapolis, and Tim Dolan, Minneapolis Chief of Police, personally and in his official capacity | PLAINTIFF'S FIRST AMENDED COMPLAINT |
| Defendants. | |

Now comes the Plaintiff, Michael Patrick Keefe, and for his First Amended Complaint against Defendants states and alleges as follows:

## **INTRODUCTION**

1. Plaintiff Michael Patrick Keefe brings this complaint seeking damages and other relief against Defendants for violations of his statutory rights and civil and constitutional rights under both federal and state constitutions, violations of federal and state statutes, including 42 United States Code Section 1981, 1983, 1985, 1986 and 1988, and for common law and/or statutory whistleblower claims as herein enumerated.

2. The incidents giving rise to Plaintiff Keefe's claims took place during Plaintiff's tenure as commander of the Violent Offender Task Force, a joint Minneapolis Police Department, ATF, and Federal Bureau of Investigation task force focusing targeted law enforcement efforts at violent and repeat offenders within the Minneapolis metropolitan area.

3. During his tenure with VOTF, Plaintiff held the rank of MPD Lieutenant. Plaintiff is a

1

veteran of nearly two decades with the MPD.

## PARTIES

4. Plaintiff is a citizen of the United States and of the State of Minnesota and resides within the metropolitan area.

5. On September 28, 2009 Plaintiff was demoted to Sergeant from the rank of Lieutenant based on his good faith reports of internal police corruption and misconduct to superiors and to outside law enforcement and investigative agencies.

6. Plaintiff also made reports of racially discriminatory and racially hostile acts, statements, and comments by fellow MPD officers which reports are protected reports under Minnesota and federal law. Keefe was a citizen of the United States and natural person residing in the State of Minnesota, County of Dakota.

7. Defendant City of Minneapolis is a political entity and person under 42 U.S.C. § 1983 and the employer of the Defendant Dolan and other police officers and is sued pursuant to Minnesota Statutes Section 466.01, et seq. The appropriate claims are also based on the doctrine of respondeat superior against Defendant City of Minneapolis as the employer of Defendant officers. The City is also a direct defendant.

8. Defendant Tim Dolan is the Minneapolis Police Chief. Dolan, allegedly, has the duty and responsibility of supervising, training and disciplining Minneapolis Police officers, including defendant officers herein.

9. All Defendant police officers were at the time and place of the incident working as on-duty Minneapolis Police officers and/or acting within the scope and course of their official duties and employment as officers with the City of Minneapolis Police Department.

10. The facts herein alleged related to the investigation and prosecution of certain individuals that occurred during Lt. Keefe's leadership of the Minneapolis Police Department's Violent Offender Task Force ("VOTF").

11. VOTF members were actively involved in the arrest and investigation of alleged gang member Taylor Trump (aka "Valachi"). During that investigation, Taylor Trump ("Trump") proffered to VOTF members and claimed to identify at least six (6) present Minneapolis police officers that were allegedly engaged in illegal activity on behalf of Trump.

12. This investigation also ultimately led to the indictment and prosecution of Officer Mike Roberts of MPD on federal charges. Officer Roberts ultimately pled guilty to certain charges after commencement of his trial. Trump also apparently sought to implicate other officers, including Lt. Lee Edwards; however, no prosecution of Lt. Edwards eventuated.

13. Additionally, Trump named Lt. Richard (Rick) Thomas; Sgt. Kevin Pulphus; Officer Tony Adams; and, Officer Craig Stoddard. Of the six officers named to authorities in Trump's in-custody interview, two were Caucasian and four are African-American. Lt. Keefe was well familiar with these officers based on his experience and service on MPD and reservations about the informant's credibility even when asked his opinions about these officers. His concerns regarding credibility were heightened by the conflicting details in Trump's "back story" regarding his familiarity and acquaintance with Lt. Edwards and Off. Roberts.

14. More concerning to Lt. Keefe were the interrogation methods employed by both F.B.I.

3

and other VOTF members. For instance, they declined to tape record the interview and use a photo lineup procedure to confirm Trump's purported identification of the accused officers. Moreover, despite detailed questioning by F.B.I. Agent Gene Laplace as to the difference between Officer Tony Adams and Sgt. Charles (Charlie) Adams, Trump later was plainly (later) unclear as to the distinctive difference in identity between the Adams brothers.

15.     At one point in his questioning, Trump referred to one officer as the "Mayor's driver". He also misidentified the first name of Officer Stoddard—calling him "Mike" Stoddard instead of Craig—his given name.

16.     Following Trump's arrest and initial interrogation, Lt. Keefe sat in on further questioning of Trump on July 25th, 2007. Prior to that, Lt. Keefe had learned from VOTF members Peterson, Wente and Snyder that Trump was changing his initial story. Peterson had been one of the first officers involved in the case that led to Trump's arrest using an informant. Wente and Snyder had been assigned to VOTF by Inspector (then Captain) Mike Martin after Lt. Keefe had specifically requested assignment of two seasoned homicide investigators, Sgts. Chris Thomsen and Scott Larson. However, Capt. Martin declined that request.

17.     Trump was now changing his story and claiming that Officer Tony Adams was not a corrupt officer—rather it was his brother, Sgt. Charlie Adams with whom he had allegedly supplied prostitutes in return for illicit favors. Lt. Keefe—aware of the significant difference in appearance between the brothers—made F.B.I. and VOTF officers aware he wanted to be present at Trump's next interrogation session—so that he could question him in detail on this

issue. Lt. Keefe was also aware that he had heard both Wente and Snyder question Trump's veracity on prior occasions.

18.     Thus, on the morning of July 25, 2007, Lt. Keefe sat in on an interview at an F.B.I. controlled location for an interview of Taylor Trump. Present at that interview were Trump; FBI agents LaPlace, Summerville and an F.B.I. analyst; and VOTF members Peterson and Lt. Keefe. Trump was initially asked about drug trafficking and gang issues. Lt. Keefe then raised the issue of the MPD officers Trump alleged had committed misconduct or criminal activity.

19.     Trump at this point changed his story regarding any involvement of Officer Stoddard—instead identifying Officer Stoddard's former partner, Officer Doran. Ironically, Doran was a member of VOTF and Trump had never identified Doran as a corrupt officer on the night of Trump's arrest. Nevertheless, he now contended that Officer Doran had received from him (Trump) "thousands of dollars". Moreover, upon further questioning by Agent LaPlace, Trump clearly had physical descriptions confused for Doran and Stoddard.

20.     Trump then went to claim that he had paid Sgt. Rick Thomas funds over the past years for favors. Lt. Keefe had not been told that initially after the first briefing by F.B.I. Additionally, at the July 25, 2007 session, Trump now added the names of two new officers, Officer Mentor and Lt. Lindback.  And while Trump denied ever giving them any funds, he nevertheless claimed to know they were "corrupt." Trump then identified them by their nicknames of Red Dog and Bat Man.  At this point, Lt. Keefe felt he observed an effort by F.B.I. agent LaPlace to terminate this interview.  Lt. Keefe felt that his efforts to obtain further information from Trump was being

obstructed—however, prior to the end of the interview, Trump further alleged that Sgt. Charlie Adams had improperly permitted Trump to escape from an active warrant with drugs (cocaine) in his possession and had also taken a firearm from Trump. Lt. Keefe did not recall being briefed by F.B.I. agents as to the allegations on the night of Trump's initial arrest. The July 25 interview was significantly different than the initial statement of Trump on the night of his arrest during which he stated that no favors were exchanged between himself and Charlie Adams.

21. Following the close of the July 25th interview, Lt. Keefe was called to a meeting with F.B.I. Special Agent in Charge Sean Boylan. Lt. Keefe was under the apprehension that the Trump operation may well be terminated based on the patent conflicts and apparent inconsistencies in Trump's statements, identifications, and accusations regarding the MPD officers. Lt. Keefe was aware of a question raised by Sgt. Lenzen regarding the ongoing nature of the Trump operation in the event that it was determined that Trump had lied to investigators. His understanding was that AUSA Wilton had been extremely clear that if Trump lied to investigators, the operation would be terminated and Trump would be prosecuted under the law.

22. Lt. Keefe was also concerned at the afternoon meeting on the 25th of July, 2007 because while the earlier interview had not been taped or audio-recorded, notes were taken by the F.B.I. Analyst present. Neither the AUSA nor the F.B.I. Analyst were present during the afternoon meeting regarding Trump's earlier interview. At the meeting S.A.I.C. Boylan appeared "upset" but no decision was made regarding Trump's inconsistencies. Present at that meeting was Lt. Keefe, Officer Peterson, Sgt. King, Sgt. Snyder, Agents LaPlace and Summerville and Supervisor Boylan.

23.     Following that meeting, Lt. Keefe advised Sgt. Snyder of his concerns regarding Trump's credibility.  Snyder reciprocated his concern about the ethics of the F.B.I. conduct regarding Trump's allegations and changing stories regarding the MPD officers. He advised that he (Keefe) would share these concerns with Capt. Mike Martin in the morning. Lt. Keefe was plainly concerned that F.B.I. was simply choosing to look the other way in the face of real credibility flaws in Trump's accusations about these officers. These flaws also, in Keefe's view, merited withdrawal of any promise of leniency toward Trump by prosecutors.

24.     On July 26, 2007, Lt. Keefe contacted his immediate supervisor, Captain Mike Martin. He expressed to him  directly that he did not agree with the way the F.B.I. was handling this case. Keefe viewed this as his direct responsibility as VOTF commander.  He asked Martin to also review a taped initial interview of Trump. This related to Trump's allegations regarding Lt. Lee Edwards.  Moreover, Lt. Keefe explained to Capt. Martin his view that F.B.I. may be appearing to hide exculpatory evidence in a criminal investigation. Lt. Keefe felt that based on Captain Martin's response that Martin did not fully comprehend the implications of concealing or attempting to conceal exculpatory evidence in a criminal matter.

25.     On July 31, 2007, Lt. Keefe held a closed-door meeting of VOTF officers who were in involved in the public corruption case. At that meeting, he advised the relevant officers that he believed Trump was lying about MPD officers. VOTF members King, Snyder, Wente, Peterson, LaPlace, and Summerville were present.

26.     On the Following day August 1, 2007 (the day of the 35W bridge collapse), at 3:45 P.M., Chief Dolan contacted Lt. Keefe advising that he would be communicating directly with F.B.I. and that all VOTF personnel were off the case with the exception of Sgts. Snyder and Wente. Later, Officer Peterson (whose informant had started this investigation with a tip) was placed back on the case as well.

27.     Because of the Bridge accident, vast numbers of officers and the entire MPD were highly occupied in the next period of days with emergency procedures. There was an order on overtime issued restricting officers' overtime except for those involved in federally funded operations. VOTF, therefore, was not seriously affected.

28.     On August 9, 2007, Trump was involved in the operation that led to the indictment of Officer Mike Roberts. Four days later and after advising his unit of Trump's perceived lack of credibility and following Chief Dolan's mandate removing all but three VOTF officers from the public corruption investigation, Deputy Chief Valerie Wurster removed Lt. Keefe from his leadership of VOTF, after being offered a "promotion" to licensing. Keefe refused the offer and was then reassigned from VOTF to Third Precinct.

29.     At the time of this action, Chief Dolan was apparently out of the city. Upon his return, Lt. Keefe met with Dolan on August 20, 2007. At that meeting, Lt. Keefe heard Dolan recede from the earlier departmental claims internal investigation that Keefe had miscarried in another VOTF investigation involving federal ATF officers.  During that same Internal investigation, Keefe had been asked if his interview of Trump was recorded. Dolan also  advised Keefe that he had been

removed from VOTF based on express F.B.I. contact to Dolan after Lt. Keefe privately and frankly advised his public corruption unit of the grave concerns about Trump's truthfulness and the failure to either cease the operation or take appropriate investigative steps to preserve exculpatory or potentially exculpatory facts in a criminal investigation and subsequent prosecution, and after Keefe reported his public policy and law officer ethical concerns to then Capt. Mike Martin, Keefe's then direct supervisor.

30. Subsequently, during the federal proceedings against MPD officer Mike Roberts and prior to the trial of the matter, Keefe received two subpoenas from attorney F.C. Tyler's office. The first subpoena was dated 4/22/09 and the second subpoena was dated 4/30/09. The second subpoena was issued as a duces tecum subpoena demanding all notes, records, recordings regarding informant/witness Taylor Trump. It also sought all notes, memoranda and recordings in connection with Michael Roberts from January 2007 to present.

31. Upon information and belief, Plaintiff alleges that Defendant Dolan was fearful of Plaintiff's potential testimony and sought to deter him from testifying in a court or tribunal.

32. Following Plaintiff's receipt of the subpoena, Defendant Dolan sustained a 2008 Internal Affairs Unit complaint against Keefe. This complaint sustaining was on information and belief an effort to chill, deter or retaliate against Keefe for his expressed views regarding the Trump operation and his potential testimony at the Roberts trial.

33. The following sequence of events occurred after receipt of the two subpoenas issued to Keefe:

    a. On 4/22/09 Keefe submitted a written complaint with the United States Department of Justice regarding the Trump public corruption investigation/operation/prosecution. Keefe advised his superior officer and supervisor, Lucy Gerold.

  b. On 5/1/09 Keefe received notice that Dolan now sustained certain IAD complaints against him from 2008, which concluded investigation in December of 2008, apparently after Defendant Dolan learned of Keefe's DOJ complaint. Dolan sustained them.

  c. On 5/1/09 Keefe received via inter-office mail a subpoena to testify in the Roberts trial via Assistant City Attorney Patrick Marzitelli. Upon information and belief, Dolan had learned of the existence of the subpoena from Marzitelli per standard department/city procedure before 5/1/09.

  d. 0n 5/8/09 Keefe was relieved of duty.

  e. 0n 5/11/09 the Robert's trial started and Keefe met C. Tyler for the first time and told him his fears of testifying, including based on fear of reprisal from others who may have acted in concert with Defendant Dolan. Keefe did not testify at the Roberts trial.

34.  As recently as September 28, 2008, Keefe was demoted from his rank of Lieutenant to Sergeant with the MPD and placed on a vague and non-specific Performance Improvement Plan.

35.  Plaintiff alleges that this plan is intended to create a framework for his potential demotion, suspension, or discharge by Defendants. Moreover, during the foregoing sequence of events, Keefe repeatedly expressed his concern about racially charged and racially motivated statements made by isolated but identifiable VOTF MPD officers about the race of the investigation suspects, including Roberts, Edwards, Adams and Adams. Keefe reported and took action as commander of VOTF to discipline and/or report racially based comments by these officers to his superiors. Keefe suffered hostility and reprisal based on these actions to oppose discriminatory conduct.

36.  Additionally, Defendant Dolan, upon information and belief, ordered a Minneapolis

officer under his command, Officer Andrew Canadeo, to provide a photograph of Plaintiff Keefe to various members of the Minneapolis City Council and to advise the council members that Plaintiff Keefe was unbalanced or otherwise untrustworthy. These actions of defendant Dolan occurred on or about May of 2009 and were intended to serve as reprisal against Plaintiff based on Plaintiff's opposition to Defendants' illegal and discriminatory action.

## CAUSES OF ACTION

### I.

### WHISTLEBLOWER CLAIMS

37. Plaintiff restates and realleges each and every allegation and paragraph of this Complaint as if fully set forth herein.

38. The actions of Defendant Minneapolis and Dolan, including the recent demotion of Plaintiff Keefe, prior paid suspensions of Plaintiff Keefe, loss of off-duty working privileges, and ongoing harassment by superior officers, and reassignment from his position as VOTF commander, were all based on Plaintiff's good faith reports of legal or policy violations by fellow VOTF members, MPD supervisors, and others which reports were consistent with Plaintiff's duties as a law enforcement officer.

39. Further, Defendants, including Minneapolis and Dolan, took immediate and causally-connected action to threaten, chill and deter Plaintiff from testifying about a matter of public concern and interest before a court or other tribunal, and retaliated against Plaintiff for appearing to testifying at said court or tribunal in response to a lawful and valid subpoena or other legal process.

40. Such actions were illegal and constituted reprisal in violation of Minnesota law, including

actions which demoted, suspended, harassed, and otherwise unfairly sanctioned Plaintiff as an employee and police officer with the City of Minneapolis. See Minn. Statutes Section 181.932.

41.     As a result of these actions, Plaintiff has suffered emotional distress, humiliation, loss of reputation, lost income, lost overtime pay, loss of off-duty privileges, lost benefits, lost status, and faces potential termination, resulting in damage to Plaintiff.

42.     Wherefore, as a direct and proximate cause of the actions of Defendant officers, Plaintiff has suffered damages in an amount in excess of fifty thousand dollars ($50,000.00).

## II.

## MHRA REPRISAL

43.     Plaintiff restates and realleges each and every allegation and paragraph of this Complaint as if fully set forth herein.

44.     The actions of Defendants Minneapolis and Dolan, constituted an illegal an improper reprisal against Plaintiff Keefe for his good faith reporting of race-based violations of MPD policy, Minnesota law, and federal law, outlawing discrimination based on race, and the Fourteenth Amendment, prohibiting racially-selective prosecutions or racially-motivated law enforcement activities.

45.     Keefe's actions and reports opposing such conduct were done in good faith.

46.     Wherefore, as a direct and proximate cause of the actions of Defendants Minneapolis and Dolan, Plaintiff has suffered damages in an amount in excess of fifty thousand dollars ($50,000.00).

## III.

## INVASION OF PRIVACY

47.     Plaintiff restates and realleges each and every allegation and paragraph of this Complaint

as if fully set forth herein.

48. Defendants in their aggressive efforts to chill and deter Plaintiff from telling the truth regarding investigative missteps, oversights, non-disclosures, failures to disclose or consider exculpatory facts based on the inconsistent proffer of facts by informant/witness Trump, engaged in a pattern of action to monitor Keefe's movements, phone calls, personal belongings and other activities under the guise of internal affairs surveillance.

49. Plaintiff was and is entitled to privacy in his personal effects, personal and private activities. Plaintiff is also entitled to not be subjected to police-sponsored harassment unrelated to his official duties or the direct disciplinary requirements of the office of sworn police officer.

50. Upon information and belief, officers acting at Defendant Dolan's direction searched Keefe's personal possessions at the workplace, monitored non-law enforcement related movements, including monitoring Keefe's cell phone location.

51. This pattern of harassment unjustifiably invaded Keefe's privacy and sought to illegally and falsely invade upon his seclusion. Defendants did so maliciously and/or recklessly.

52. Wherefore, as a direct and proximate cause of the actions of Defendant officers, Plaintiff has suffered damages in an amount in excess of fifty thousand dollars ($50,000.00).

### IV.

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

53. Plaintiff restates and realleges each and every allegation and paragraph of this Complaint as if fully set forth herein.

54. The actions of Defendants were malicious, unjustified and unreasonable and so outrageous as to be non-endurable in a civilized society. Further such actions invaded and

violated Plaintiff's liberty interests and rights. Such actions were unjustified and were committed with malice for Keefe.

55. As a result of these outrageous actions and assaults, Plaintiff was caused severe emotional and mental distress, resulting in harm and injury to Plaintiff.

56. Wherefore, as a direct and proximate cause of the actions of Defendant officers, Plaintiff has suffered damages in an amount in excess of fifty thousand dollars ($50,000.00).

57. Wherefore, as a direct and proximate cause of the actions of Defendant officers, Plaintiff has suffered damages in an amount in excess of fifty thousand dollars ($50,000.00).

## V.

## 42 USC § 1983

### DUE PROCESS VIOLATIONS

58. Plaintiff restates and realleges each and every allegation and paragraph of this Complaint as if fully set forth herein.

59. The actions of Defendants, including Dolan Officer, were conducted under color of law and while acting within the scope of their authority as Minneapolis Police officers.

60. Such actions intentionally and recklessly constituted "constitutional torts," including violating and depriving Michael Patrick Keefe of his right to due process of law, all in violation of rights under the Fifth and Fourteenth Amendments to the United States Constitution and Title 42 United States Code Section 1983. Specifically, Keefe is entitled to carry out his duties as a police officer free from the threat of ongoing official intimidation, harassment, or the threat of internal or external prosecution in retaliation for said adherence to duty.

61. Further, the actions of the Defendant Dolan were inherently shocking to the conscience. See *Rochin v. California*, 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205 (1952).

62. As a result of these outrageous actions and assaults, Plaintiff was caused severe harm, including the loss of constitutional rights and liberties, serious, temporary and/or permanent physical injury and other emotional and mental distress, resulting in harm and injury to Plaintiff.

63. Wherefore, as a direct and proximate cause of the actions of Defendant officers, Plaintiff has suffered damages in an amount in excess of fifty thousand dollars ($50,000.00).

## VI.

## 42 U.S.C. § 1983

## MONELL CLAIM

64. Plaintiff restates and realleges each and every allegation and paragraph of this Complaint as if fully set forth herein.

65. The pattern or practice of illegal and condoned police misconduct is tacitly or overtly sanctioned by the conduct of Defendants Dolan and the City of Minneapolis.

66. Thus, such behavior is carried out pursuant to a policy, procedure or custom, whether formal or informal, which violates constitutional rights of persons situated such as Plaintiff.

67. As a result of these illegal and unconstitutional policies, procedures or customs, Plaintiff was caused severe harm, including the loss of constitutional rights and liberties, physical injury and other emotional and mental distress, resulting in harm and injury to Plaintiff.

68. Wherefore, as a direct and proximate cause of the actions of Defendant officers, Plaintiff has suffered damages in an amount in excess of fifty thousand dollars ($50,000.00).

## VII.

## 42U.S.C. § 1986

69.     Plaintiff restates and realleges each and every allegation and paragraph of this Complaint as if fully set forth herein.

70.     The actions of each police officer Defendant, the City of Minneapolis and Defendant Dolan in failing to prevent such a tacit agreement and conspiracy to violate rights under 42 USC §§ 1985 and 1983 constitutes a violation of 42 USC § 1986.

71.     As a result of these illegal and unconstitutional policies, procedures or customs, Plaintiff suffered severe harm, including the loss of constitutional rights and liberties, physical injury and other emotional and mental distress, resulting in harm and injury to Plaintiff.

72.     Wherefore, as a direct and proximate cause of the actions of Defendant officers, Plaintiff has suffered damages in an amount in excess of fifty thousand dollars ($50,000.00).

## VIII.

## 42U.S.C. § 1981

## REPRISAL

73.     Plaintiff restates and realleges each and every allegation and paragraph of this Complaint as if fully set forth herein.

74.     The actions of Defendants Minneapolis and Dolan, constituted an illegal an improper reprisal against Plaintiff Keefe for his good faith reporting of race-based violations of MPD policy, Minnesota law, and federal law, outlawing discrimination based on race, and the Fourteenth Amendment, prohibiting racially-selective prosecutions or racially-motivated law enforcement activities.

75.     Keefe's actions and reports opposing such conduct were done in good faith.

76. Wherefore, as a direct and proximate cause of the actions of Defendants Minneapolis and Dolan, Plaintiff has suffered damages in an amount in excess of fifty thousand dollars ($50,000.00).

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Michael Patrick Keefe prays for judgment and the following relief against each and every Defendant, jointly and severally.

A.  Reasonable damages in an amount in excess of Fifty Thousand Dollars;

B.  Injunctive and declaratory relief;

C.  Attorneys fees and expert costs under 42 USC § 1988;

D.  Any and all other relief available, including pre-verdict and post-verdict interest, costs, fees and disbursements; and

E. After motion, hearing, and Order, a claim and judgment for punitive damages.

F. Plaintiff demands a jury trial as to issues so triable.

G. All available statutory damages, including punitive damages pursuant to 42 United States Code Section 1983, following a motion and order.


Dated: July 13, 2010                           **GOINS LAW OFFICES**


  s/Albert T. Goins, Sr.
Albert T. Goins, Sr., #126159
301 Fourth Avenue South
378 Grain Exchange Building
Minneapolis, MN 55415
(612) 339-3848 telephone
612-339-3853 facsimile

-and-

**WARD LAW GROUP**
Damon L. Ward, ID # 221442
431 South 7th Street
Suite 2485
Minneapolis, MN 55415
(612) 872-1100
(612) 872-1129

**ATTORNEYS FOR PLAINTIFF
MICHAEL PATRICK KEEFE**